**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Francis E. Kepple

     v.                           Civil No. 10-cv-331-LM

Unknown Warden, Northern New
Hampshire Correctional Facility[1]


**O R D E R**


Francis E. Kepple has filed a petition for a writ of habeas corpus (doc. no. 1).  The petition asserts two claims alleging that Kepple's conviction was obtained in violation of his Fourteenth Amendment due process rights.  Before the court is Respondent's motion for summary judgment (doc. no. 8) and Petitioner's objection to the motion (with attached exhibits) (doc. nos. 11 and 14).[2]  For the reasons that follow, the motion for summary judgment (doc. no. 8) is granted, and the petition for a writ of habeas corpus (doc. no. 1) is denied.

---

[1]When Kepple initially filed this petition, the named respondent was Larry Blaisdell, who was then the warden of the Northern New Hampshire Correctional Facility.  Since then, Mr. Blaisdell has left that position.  At present, the New Hampshire Department of Corrections website lists the warden position at that facility as "vacant."

[2]The parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

**Factual Background**

I.   J.P.'s Story

In June 2001, Francis Kepple invited J.P., the fifteen-year-old stepdaughter of Kepple's own stepdaughter, to earn some extra money by cleaning a house in Raymond, New Hampshire, where Kepple had been hired to do maintenance work.  J.P. agreed, and on the appointed date, Kepple picked J.P. up at her home and the two travelled to Raymond.

J.P. testified that while she was cleaning the kitchen of the house in Raymond, she found an unopened bottle of vodka. J.P. admitted at trial that she had substance abuse problems which included problems with alcohol and other drugs.  When J.P. found the bottle, she took it.  Eventually, J.P. asked Kepple about the bottle, and he told her that he had purchased it for her.  J.P. mixed the vodka with Pepsi and drank either one-third or one-half of the bottle.  J.P. got hungry and Kepple purchased a steak and cheese sandwich for her.  After eating the sandwich, J.P. started to feel sick.  Kepple told her she could lie down in a downstairs bedroom.

According to J.P.'s testimony, she went to lie down because her stomach hurt.  She threw up in a trash can in the bedroom. Kepple came into the room, sat next to her on the bed, and rubbed her stomach.  Kepple then proceeded to undo and remove J.P.'s pants and perform oral sex on J.P.  J.P. testified that

she was in a diminished state of awareness at the time because of the large amount of alcohol she had consumed. Kepple then stood next to the bed, began to masturbate, and asked J.P. if she would like to engage in another sex act with him.

J.P. testified that at that point, she snapped into a sharper mental state, became aware of what was going on, jumped up, and dressed as quickly as she could. J.P. left the house and started walking down the street. J.P. stated that Kepple drove up next to her, and she agreed to get into his truck so that he could drive her home. Kepple paid her for cleaning the house and dropped her off near her home.

In an effort to put it out of her head, J.P. did not tell anyone else about the sexual assault by Kepple for several months. After school started, however, J.P. discovered she could not put it out of her head, and told her best friend, Jenny, about the assault. Jenny told a school counselor who spoke to both J.P. and Jenny. The counselor reported the assault to the police. The counselor's report of this meeting notes that J.P. had also been sexually assaulted by an uncle in the past.

J.P. met with Lt. Shawn Coope of the Raymond Police Department. Coope drove J.P. to the house to identify the precise location where the assault took place. The police then arranged to have J.P. interviewed by the Child Advocacy Center

("CAC") in Portsmouth, an organization that conducts a single comprehensive interview of a child who reports that he or she has been sexually assaulted for use by the police and prosecutor.  The interview was videotaped.

During the interview, J.P. recounted to the interviewer the same essential facts that she later testified to at trial. During the interview, J.P. also stated that she should have known better than to drink when she was with adult men.  J.P. stated that on a prior occasion, when she was suspended from school, her uncle came over and the two were drinking.  J.P. stated that her uncle tried to kiss her.  J.P. told the interviewer that she had reported the incident to the police, and that at some point she had accompanied the police to the location where the incident had occurred, but "nothing happened" as a result of her report.

After the CAC interview, Coope, with J.P.'s permission, arranged to record a phone conversation between J.P. and Kepple. After making the appropriate arrangements, J.P. called Kepple at home.  During the conversation, Kepple made a number of nonspecific yet inculpating statements regarding the incident that had occurred between them.  Notably, the following exchanges occurred during the phone conversation:

> J.P.:    You told me that you haven't been with any
>          young girl before … why did I have to be the

4

first one?  Why did you have to do this to
me?

Kepple:    Um, I don't know.

    . . .

J.P.:      You molest me, you put me through all this
shit, and that's what you have to say this
is what's in your mind.

Kepple:    No.  I'm trying to rationalize why I did
something like this to you.  Where I, I
think so much of you.  And I can't
understand my own, why I did this, something
like that to hurt you as badly as I know, I
know I hurt you badly.  I can't, I can't
understand why I did it, why I would take
advantage of you.

    . . .

J.P.:      I just want to know why you did this.

Kepple:    I don't know.  Because, um,

    . . .

J.P.:      You can't just ruin someone's life and tell
them I don't know.

Kepple:    No, because you, you attract me.

J.P.:      I attract you?

Kepple:    No.  You were attractive like, is what I
meant.

J.P.:      You're fucking disgusting!  I'm 16, you're
how fucking old? That's disgusting.

Kepple:    Uh, I know it is, very, very, and I told you
that before.

II.  Kepple's Story

    Kepple's testimony at trial contradicted J.P.'s testimony
on a number of points.  Kepple testified that he brought J.P. to
the house in Raymond to help her earn some money.  Kepple stated
that J.P. did find, and drink, alcohol at the house, but that he
did not purchase the alcohol, place it where J.P. would find it,
or otherwise do anything to encourage her to drink it.

    Kepple stated that after drinking alcohol and eating a
greasy steak and cheese sandwich, J.P. began to feel sick.  She
went to lie down in a bedroom.  Kepple states that when he went
downstairs to check on J.P., he saw that she had vomited all
over the room, including on the bed.  Kepple was upset about the
mess she made in the room and testified that, in the heat of the
moment, he yelled "You little whore!" at J.P.  Kepple stated
that his exclamation upset J.P., and she ran out of the house.
Kepple got into his truck, picked J.P. up down the street and
drove her home, dropping her off near her house.

    Kepple stated that he felt terrible about calling J.P. a
"whore," that he was upset and spoke without thinking, and that
it should never have happened.  Kepple testified that he never
sexually assaulted J.P. or otherwise harmed her, aside from
calling her a name.

    Kepple admitted that the recorded conversation with J.P.
occurred, but testified that all of the references that he made

during that conversation to an act that he felt badly about,
that had hurt J.P., or that would "kill Gram," were references
to his feelings and concerns about calling J.P. a "whore."
Kepple stated that his comment that he was attracted to J.P. was
not a reference to sexual attraction, but an expression that he
was drawn to her as a person because she had been a troubled
child.  Kepple did not offer any additional explanation at trial
as to what his understanding was of J.P.'s comments during the
phone conversation that he had never "been with a young girl
before" or that he had "molested" her.

## Procedural Background

I.   <u>Pretrial Discovery Hearing and Trial</u>

Prior to the trial in this matter, Kepple filed a motion
seeking discovery of, among other things, the identity of
certain witnesses whose names had been redacted in the discovery
that had thus far been provided – mostly J.P.'s friends and
other individuals to whom she reported that Kepple had sexually
assaulted her.  <u>See</u> Def.'s Mot. to Order State to Disclose
Identities and Location of Witnesses (hereinafter "Pretrial
Motion") (doc. no. 13, Ex. 1).[3]  In that motion, and at the
hearing thereon, Kepple requested information regarding the

_____

[3]The Pretrial Motion was filed in Kepple's criminal case,
which was docketed in the Rockingham County Superior Court as
<u>State v. Kepple</u>, No. 02-S-552-556.

prior sexual assault by the "uncle in Fremont" referred to in both J.P.'s school counselor's report and the CAC interview. Kepple specifically requested the uncle's name and identifying information and asked for further information on any charges or litigation that may have resulted from the accusations J.P. had made. In the Pretrial Motion, Kepple argued that J.P.'s previous accusation against the uncle in Fremont was "potentially at least, a source of highly relevant information – particularly if that accusation is found to have been false and/or if a criminal charge against the 'uncle' was made but later dropped."

In its response to the Pretrial Motion the prosecutor objected to "providing the Defendant with any information regarding the 'Uncle' from Fremont as well as other witnesses whom the State has no information about, and who the State believes have no exculpatory information." Resp. to Def.'s Mot. to Disclose Identities and Locations of Witnesses (doc. no. 13, Ex. 2). The prosecutor also asserted that "[t]he State has no information regarding the 'uncle' in Fremont. It is the State's understanding that this matter was never litigated but was merely an allegation."

On March 28, 2003, prior to trial, a hearing was held in the Superior Court (hereinafter "Pretrial Hearing") on a number of motions, including the Pretrial Motion, a motion to suppress

the one-party intercept phone conversation between J.P. and
Kepple, a motion to admit J.P.'s prior sexual activity in
evidence, a motion to obtain discovery of J.P.'s mental health
records and records related to substance abuse treatment, and a
motion seeking permission to take J.P.'s deposition.

At the Pretrial Hearing, Kepple requested the identity of
the uncle and information about any charge or litigation that
may have ensued as a result of J.P.'s accusation.  Kepple also
sought the court's permission to admit at trial information
about J.P.'s encounter with the uncle as evidence of prior
sexual activity.

Kepple argued that the fact that J.P. had previously been
sexually assaulted, or had previously made such an accusation,
was relevant to his defense.  Kepple explained that his intended
defense at trial would be that J.P. was fabricating the
accusation against him because she was a troubled, unstable
girl, who was angry that her uncle was not fully prosecuted
after sexually assaulting her, and that she had accused Kepple
of sexual assault due to her resultant need for revenge against
the world, men in general, and male family members in
particular.

Referring to Kepple's assertion that J.P. was seeking
revenge against Kepple for wrongs done to her by others, the
Pretrial Hearing judge asked Kepple's attorney: "Other than your

imagination, what causes you to say that?"  Kepple's attorney
conceded that he had no more than his "fertile" imagination upon
which to base his argument that the uncle might be able to
provide useful information.  Pretrial Hearing Tr. at p. 49-50.
Aside from the possibility that the uncle could either confirm
that he had sexually assaulted J.P., but had not been
prosecuted, or that he had not sexually assaulted J.P., and that
the allegation against him was false, which was implicit in his
argument, Kepple's attorney did not offer any factual or other
basis to support his assertion that the uncle would provide him
with information useful to Kepple's defense.  Kepple's attorney
reminded the court that he was seeking discovery in order to be
able to ascertain those answers.

At the Pretrial Hearing, or shortly thereafter, the
prosecutor provided Kepple with names and contact information
for all of the witnesses in the case whose names had been
redacted in the discovery.  The prosecutor did not provide
Kepple with the name or other identifying information about the
uncle.  The prosecutor stated during the hearing that he was
aware that no criminal charge had come out of J.P.'s accusation
against the uncle, no litigation occurred regarding that
accusation, and that the only information he had about the
matter was what J.P. had said in her CAC interview, of which
Kepple had a transcript.  The prosecutor also opined that based

upon the statement in the interview that the uncle had tried "kissing and stuff," the only offense he could have been charged with, presuming that was the extent of the alleged assault, was attempted simple assault, and not sexual assault.  The prosecutor stated that it was his understanding, based on a conversation with J.P.'s family members, that J.P. may have reported the "uncle" incident to the police.

The prosecutor argued that, because there was no litigation of the "uncle issue," and therefore no adjudication as to whether or not the accusation was true, the accusation could not come into evidence at trial to contest J.P.'s credibility.  To the extent Kepple sought to introduce that incident as prior sexual activity, the prosecutor argued it had no relevance to the case at hand.  The prosecutor did not state whether he had made any attempt to obtain the uncle's identity, or any other information concerning the incident, from a family member or from the law enforcement agency to which the "uncle" incident had been reported.

On April 10, 2003, the court issued an order (hereinafter "2003 Order") (doc. no. 13 Ex. 3), which disposed of all of the motions argued at the Pretrial Hearing.  In the 2003 Order, the court found that the State had provided Kepple with the identity of each witness for whom Kepple had requested such information. The court denied Kepple's motion to introduce J.P.'s prior

sexual activity at trial, deeming such evidence irrelevant.  The
2003 Order made no other specific reference to the uncle
incident, or to any other information Kepple requested regarding
the uncle incident.

Kepple filed neither a motion to reconsider nor any motion
to renew his request for discovery regarding the uncle incident.
At trial, Kepple made no effort to question J.P. regarding the
uncle incident and did not alert the court of any desire to do
so.  The jury found Kepple guilty of the charges against him.
On June 10, 2003, Kepple was sentenced to serve 20 to 40 years
in prison.

II.  Direct Appeal

Kepple raised ten issues in the notice of direct appeal of
his conviction, which he filed on July 10, 2003 (hereinafter
"Notice of Direct Appeal") (doc. no. 5, Ex. A).  Two issues in
the Notice of Direct Appeal, reproduced below, were ostensibly
relevant to the question now raised in Kepple's federal habeas
petition:

- Did the trial court prejudicially err refusing to
  grant the defendant's pretrial motion for production
  of [medical, mental health, and substance abuse
  treatment] records in the first instance, where the
  defendant, based on longtime, extensive contact with
  the alleged victim and her family, made a
  substantial threshold showing pursuant to State v.
  Howard, 121 N.H. 53, 426 A.2d 457 (1981), that the
  alleged victim had experimented extensively with

drugs, alcohol, and sex; that she had extensive
psychiatric treatment; that she had engaged in a
number of episodes of bizarre behavior; that she had
been suspended from school several times because of
such behavior; and that she had previously accused
another male family member of sexual assault on a
prior occasion?

- Did the lower court prejudicially err and/or abuse
  its discretion in refusing to allow the defendant to
  conduct a pretrial deposition of the complainant
  and, in particular, in refusing to force the
  complainant to disclose the particulars of an
  alleged prior incident of sexual assault allegedly
  perpetrated upon the complainant by "an uncle in
  Fremont," where (a) the defendant charged that the
  complainant's accusation against him was a complete
  fabrication, born of the complainant's mental and
  emotional instability; (b) the manner in which the
  alleged prior assault was claimed to have occurred
  bore a striking resemblance to the incident which
  formed the basis of the complainant's accusation
  against the defendant himself, in that the incident
  reportedly involved another male family member who
  supposedly induced the complainant to accompany him
  to a remote location where he plied her with alcohol
  as a prelude to sexual assault; (c) the defendant
  was aware that the complainant had been suspended
  from school for misconduct on at least two separate
  occasions, but did not know the details of the
  suspensions and had no reasonable means of
  ascertaining them by other methods; and (d) the
  defendant specifically asked the lower court for
  permission to conduct the complainant's deposition
  and specifically cited the aforementioned
  circumstances (and others) as reasons for his
  request?

Kepple filed a brief challenging only the denial of his pretrial

motion to suppress the one-party intercept telephone call.  See

Br. For Def. (doc. no. 5, Ex. B).  The New Hampshire Supreme

Court ("NHSC") denied the appeal and affirmed Kepple's

conviction.  See State v. Kepple, 151 N.H. 661, 866 A.2d 859

(2005).  The NHSC opinion does not contain any ruling or
reference to the issues that were not briefed, including those
issues reproduced above.


III. <u>Motion for New Trial, Resentencing, and 2006 State Habeas
     Petition</u>

     After losing his appeal, Kepple hired another attorney to
review the case to determine whether he had any further recourse
regarding the one-party intercept issue.  That attorney, after
examining the trial record, filed a motion seeking a new trial
and sentencing on the grounds that, although not litigated by
Kepple's trial attorney, there were infirmities with several of
the charges of which Kepple had been convicted.  As a result of
that motion, on April 18, 2006, one of Kepple's convictions was
vacated, one was reduced from a Class A felony to a Class B
felony, and one was reduced from a Class B felony to a
misdemeanor.  Kepple's motion for a new trial, alleging that he
was denied a fair trial because his trial counsel was
ineffective, was denied.  <u>See</u> Doc. No. 5, Ex. F.  Kepple was
resentenced to a 13½ - 26 year prison term for the two felonies
that remained, and twelve months in the house of corrections on
the charge that had been reduced to a misdemeanor.

     On May 17, 2006, Kepple appealed the portion of his post-
trial litigation that had not been successful to the NHSC.  His

appeal was denied in State v. Kepple, 155 N.H. 267, 922 A.2d 661 (2007).

Kepple subsequently filed a pro se habeas petition in state court, alleging that his post-conviction counsel had been ineffective.  He was denied relief in the Superior Court and did not file an appeal.


IV.   2009 State Habeas Proceedings

While incarcerated, Kepple obtained four pages of computerized log entries from the Fremont Police Department ("FPD") regarding the uncle incident.  The log entries were dated in November 2000, well before Kepple made his pretrial requests for the information contained therein and well before the Pretrial Hearing.

The FPD log entries reveal that on November 7, 2000, approximately one and a half years prior to the incident between J.P. and Kepple, J.P. reported that she had been assaulted near a gravel pit in Fremont, New Hampshire, by a relative, and that alcohol was involved.  The log entries reveal that the matter was briefly investigated as a possible simple assault and for a charge of providing alcohol to a person who is not of legal drinking age.  The FPD took J.P.'s report, drove her to find the location of the alleged assault, and later returned to that area in an attempt to collect evidence.  The FPD log entries contain

the name and address of the uncle – precisely the information
Kepple had sought prior to his 2003 trial.

Upon learning that the FPD possessed the information which
he had sought prior to trial, and which the prosecutor did not
provide to him, Kepple, proceeding through original trial
counsel, filed a second petition for a writ of habeas corpus in
the state court on October 22, 2009 (hereinafter the "2009
Petition") (doc. no. 13, Ex. 4).  Kepple argued in the 2009
Petition that:  (1) the state had failed to provide potentially
exculpatory information, the identity of the uncle that was in
its possession prior to trial, in violation of Kepple's rights
under Brady v. Maryland, 373 U.S. 83 (1963); and (2) the state
had asserted that it did not possess the information requested,
when, in fact, the FPD did possess the information at the time
and, pursuant to state law and Kyles v. Whitley, 514 U.S. 419,
437 (1995), the prosecutor is charged with knowledge of
information in the possession of a law enforcement agency.

Kepple further argued that he had been prejudiced by the
failure of the prosecutor to provide the information when
requested, as the uncle's address listed in the FPD log was no
longer valid.  As a result of the prosecutor's suppression of
this information, and the resultant delay in Kepple's learning
the identity of the uncle, Kepple argued that potentially
exculpatory evidence had been lost.

On December 7, 2009, a hearing was held on the 2009
Petition in the Coos County Superior Court (hereinafter the
"State Habeas Court").  The State Habeas Court denied the
petition in a written order dated December 28, 2009 (hereinafter
the "2009 Order") (doc. no. 5, Ex. J).  The 2009 Order addressed
the issue of the uncle-related evidence.  The State Habeas Court
in reviewing the facts then in the record found that Kepple had
moved pretrial for "information and documentation concerning the
other allegation [of an assault]."  The State Habeas Court
further found that in the Pretrial Order, the court had denied
the request for the uncle's identity as moot, by finding that
all of the requested witnesses' names had been provided to
Kepple.

The State Habeas Court went on to find that "[i]f the trial
court erred in finding the petitioner's motion for discovery
moot, the petitioner should have briefed that issue on appeal."
With that, the State Habeas Court determined that, by failing to
appeal the erroneous mootness ruling, and by failing to brief on
direct appeal any issue relating to discovery or the uncle
incident, Kepple waived the issue, and it could not be raised
again in a post-conviction habeas petition.

The State Habeas Court also found that, were it to reach
the merits of the Brady argument, it would deny Kepple relief on
that basis as well.  In the 2009 Order, the court found that

17

Kepple failed to demonstrate that the previously undisclosed
evidence regarding the uncle incident was exculpatory.  The
court specifically found that the FPD report eventually provided
to Kepple

> does not necessarily impeach the victim's credibility,
> support his defense, or tend to exonerate him.  The
> petitioner's theory of the case was that the victim
> was emotionally unstable.  The petitioner has not
> shown how the report from Fremont, which shows only
> that the police investigated a prior report of simple
> assault and prohibited sale of alcoholic beverage,
> would inform or aid that defense.  The petitioner
> already knew about the prior allegation from the child
> advocacy center interview and other discovery, and he
> does not explain how this report, in particular, was
> favorable.

Kepple filed a notice of discretionary appeal in the NHSC
on February 24, 2010, challenging the 2009 Order (hereinafter
"2010 Notice of Discretionary Appeal").  The NHSC declined the
appeal on April 28, 2010 (doc. no. 5, Ex. L).


V.   Federal Habeas Petition

Kepple filed the instant petition for a writ of habeas
corpus on August 2, 2010, raising three grounds for relief.  The
court initially found that two of the claims were untimely, but
that Kepple's Brady claim could proceed.  See Doc. No. 3.  The
following claim, as set forth in this court's prior order (doc.
no. 3), was raised in the 2010 Notice of Discretionary Appeal:

> Kepple's Sixth and Fourteenth Amendment rights to due
> process, confrontation, and a fair trial, as set forth

18

in Brady v. Maryland, 373 U.S. 83 (1963), and its
progeny, were violated when the state failed to
disclose exculpatory evidence in its possession before
trial, and represented that the evidence did not
exist, where the information existed and was in the
state's possession, and: (a) the information was
likely to lead to evidence that would support Kepple's
defense at trial; and (b) the information would have
assisted Kepple in obtaining psychological records
bearing on the complaining witness' credibility.[4]

Respondent has now moved for summary judgment on the
Brady claim in the petition (doc. no. 8).  Petitioner
objects (doc. no. 11).

### Standard of Review

Summary judgment may be granted "if the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56.  Neither party here contends that an evidentiary
hearing is necessary to resolve any dispute in the facts of the
case; the relevant facts are available in the record.  The
matter therefore may be resolved on the papers.

---

[4]Kepple's Brady claim has been referred to as two separate
claims during these proceedings.  In fact, Kepple has raised a
single Brady claim – that the state failed to provide him with
certain exculpatory evidence to which he was entitled – which
impacted his 2003 trial in two ways: (1) he was denied
information that could have assisted him in obtaining J.P.'s
confidential records prior to trial; and (2) he was denied
information that might have supported his defense at trial.

I.   <u>Review of State Court's Decision on the Merits</u>

The Antiterrorism and Effective Death Penalty Act ("AEDPA") sets forth the appropriate standard of review, to the extent that the state courts previously ruled on the merits of Kepple's claims.  <u>See</u> 28 U.S.C. § 2254(d); <u>Dugas v. Coplan</u>, 506 F.3d 1, 6-7 (1st Cir. 2007) (federal review of habeas petitions normally governed by § 2254(d) where claim was adjudicated on merits in state court).  As discussed herein, to the extent the claim raised by Kepple was adjudicated on the merits in the state courts, the review in this case is governed by AEDPA.


A.   <u>AEDPA Standard</u>

The Supreme Court has summarized the AEDPA standard as follows:

> [A] federal court may not grant habeas relief on any claim that was adjudicated on the merits in State court proceedings unless the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

<u>Cullen v. Pinholster</u>, ___ U.S. ___, ___, 131 S. Ct. 1388, 1414 (2011) (internal quotations omitted) (citing <u>Harrington v. Richter</u>, ___ U.S. ___, ___, 131 S. Ct. 770, 787 (2011), and § 2254(d)).  AEDPA "'imposes a highly deferential standard for

evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'"  Felkner v. Jackson, ___ U.S. ___, ___, 131 S. Ct. 1305, 1307 (2011) (quoting Renico v. Lett, 559 U.S. ___, ___, 130 S. Ct. 1855, 1862 (2010)).  This standard is difficult for a petitioner to meet "because it was meant to be" difficult.  Richter, 131 S. Ct. at 786; see also Jewett v. Brady, 634 F.3d 67, 75-76 (1st Cir. 2011).

> [AEDPA] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.  It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.

Richter, 131 S. Ct. at 786 (internal quotation marks and citation omitted).  If the state court's decision neither unreasonably determined the facts, nor unreasonably applied federal law thereto, this court must defer to the state court's factual and legal rulings, and must deny the petition.  See Pinholster, 131 S. Ct. at 1398.


B.   Petitioner's Burden Under AEDPA

Under AEDPA, a federal habeas petitioner bears the burden of demonstrating that the challenged state court resolution of the federal constitutional issues "resulted in a decision that

21

was contrary to, or involved an unreasonable application of,
clearly established Federal law, as determined by the Supreme
Court of the United States," see 28 U.S.C. § 2254(d)(1), or
"resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in
the State court proceeding," see id. § 2254(d)(2).

The Supreme Court has explained the distinction between
decisions that are "contrary to" clearly established federal
law, and those that involve an "unreasonable application" of
that law:

> Under the "contrary to" clause, a federal habeas court
> may grant the writ if the state court arrives at a
> conclusion opposite to that reached by [the Supreme]
> Court on a question of law or if the state court
> decides a case differently than [the Supreme] Court
> has on a set of materially indistinguishable fats.
> Under the "unreasonable application" clause, a federal
> habeas court may grant the writ if the state court
> identifies the correct governing legal principle from
> [the Supreme] Court's decisions but unreasonably
> applies that principle to the fact of the prisoner's
> case.

Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  To demonstrate
that a state court's application of federal law was
"unreasonable," petitioner must do more than show that the state
court's application of the law was wrong.  See id. at 410-11.
Instead, "[a] state court's determination that a claim lacks
merit precludes federal habeas relief so long as 'fairminded
jurists could disagree' on the correctness of the state court's

decision." Richter, 131 S. Ct. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Similarly, federal courts may not grant an application for a writ of habeas corpus "based on a claim already adjudicated on the merits in state court unless that adjudication 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Wood v. Allen, ___ U.S. ___, ___, 130 S. Ct. 841, 845 (2010) (quoting 28 U.S.C. § 2254(e)(1)). Accordingly, the federal habeas court must confine itself to the record on which the state court's decision was based. See Pinholster, 131 S. Ct. at 1399. This court must presume that a state court's determination of a factual issue is correct. See Wood, 130 S. Ct. at 845. "[T]he petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." Id.; see also 28 U.S.C. § 2254(e)(1).


II. Review of State Court's Waiver Determination

"A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Walker v. Martin, ___ U.S. ___, ___, 131 S. Ct. 1120, 1127 (2011) (internal quotation marks and citations omitted). A procedural barrier to resolving a

claim on the merits in state court is an independent and adequate state law ground that precludes federal habeas relief. Id.

An "adequate" procedural ground is a state rule that is "firmly established and regularly followed." Beard v. Kindler, ___ U.S. ___, 130 S. Ct. 612, 618 (2009). To qualify as "firmly established and regularly followed," the state rule need not be mandatory, it may allow state court judges a certain amount of discretion in applying the rule. See id.; Martin, 131 S. Ct. at 1127-28, 1130. "Application of those rules in particular circumstances . . . can supply the requisite clarity." Martin, 131 S. Ct. at 1128. Federal habeas courts are required to carefully examine state procedural rules "to ensure that they do not operate to discriminate against claims of federal rights." Id. at 1130. Where the record reveals no basis for concluding that the state procedural rule was applied in a manner that was discriminatory, unfair or surprising in a particular case, a federal habeas court may rely on the adequacy of the state procedural ground for rejecting petitioner's claim. Id. at 1130-31.

## Discussion

The 2009 Order denied Kepple's habeas petition on two independent grounds. First, the court ruled that Kepple waived

his Brady claim, because he had failed to present the issue to the NHSC in his direct appeal.  Second, the court found that Kepple failed to demonstrate that the information he sought, and eventually received, was exculpatory, and that therefore, his Brady claim failed on the merits.  The court will consider each finding in turn, applying the appropriate standard as set forth above.

I.   Waiver

The 2009 Order does not cite any federal law to support its ruling that Kepple waived the "failure to disclose exculpatory evidence" issue by failing to address it in his direct appeal. Instead, the 2009 Order cites state law as follows: "A petitioner who has 'both knowledge of the issue and an opportunity to raise it properly' on direct appeal, but fails to do so, may procedurally waive the issue for collateral review in a habeas corpus proceeding."  2009 Order (quoting Avery v. Cunningham, 131 N.H. 138, 143, 551 A.2d 952, 955 (1988)).  The State Habeas Court then went on to find that petitioner knew of and raised the issue of the state's failure to disclose information related to the uncle prior to trial.  That court then found that while the Pretrial Order did not squarely address the issue, Kepple was aware, at the time the Pretrial Order was issued, that he was not granted the relief he sought.

Therefore, the State Habeas Court reasoned, Kepple had the
opportunity to challenge the Pretrial Order and the denial of
relief therein, as well as the state's failure to disclose
evidence, in his direct appeal.  The State Habeas Court found
that under New Hampshire law, because Kepple knew of and chose
not to brief any issue related to the state's failure to
disclose information about the uncle incident, as well as the
trial court's failure to order such disclosure, he waived the
argument and was procedurally barred from relitigating it in the
state courts.

Kepple claims that the precise ground raised in the present
petition was not known to him at the time of his direct appeal
because he has only recently acquired the FPD logs that revealed
the state's pretrial possession of the uncle's identity.  Kepple
argues that the state represented that the information he sought
did not exist, which ended the inquiry.  The record, however,
does not bear out Kepple's assertion regarding the state's
representations.  At the Pretrial Hearing, the state
acknowledged that there was an incident involving J.P. making an
accusation that an uncle had provided J.P. with alcohol and had
attempted to assault her.  The state further acknowledged that
the allegation was reported to the police, who conducted some
investigation but never filed a criminal charge in the matter.

The prosecutor asserted that the state had no further information regarding the incident.

Kepple asserts here that the prosecutor's statement that he had no further information about the uncle incident, was misleading; Kepple argues that he did not make a Brady argument on appeal regarding the uncle's identity, because the prosecutor's statement constituted an assertion that the information did not exist.  Kepple contends here that he would have been unable to prevail on appeal in challenging the failure of the 2003 Order to direct production of such nonexistent evidence.  Kepple argues that he was therefore only able to raise this issue after discovering that the information existed and was in the FPD logs.

While the prosecutor incorrectly asserted that the "state" was not in possession of information concerning the uncle, as FPD possession was "state" possession, the prosecutor never denied that he had access to the information sought.  The prosecutor's acknowledgment at the Pretrial Hearing that he was aware that a report was made to the police, and that a police investigation occurred regarding the incident, counters Kepple's assertion that the prosecutor claimed the information did not exist.  The prosecutor's objection to Kepple's request that he produce the evidence was broader than a claim that the information did not exist.  The prosecutor did assert that the

27

state did not possess information about the incident that had not already been provided in discovery.  Additionally, however, the prosecutor objected to producing the information on the basis that Kepple's request sought evidence that was not exculpatory, likely to lead to the discovery of exculpatory information, or admissible at trial.

The State Habeas Court found that the 2003 Order did not afford Kepple the relief he had sought in his Pretrial Motion and at the Pretrial Hearing.  The State Habeas Court found the 2003 Order could be read as erroneously finding that the uncle's identity had already been disclosed.  The State Habeas Court further found that the 2003 Order could be read as denying Kepple's request for production of the uncle's identity on the ground that the information was not admissible or otherwise required to be produced.  The State Habeas Court found that either way, these rulings were waived by Kepple's failure to brief them in his direct appeal.

The State Habeas Court found that Kepple had the ability to raise the issue and challenge the 2003 Order on direct appeal but had declined to do so.  Nothing in the record provides any basis for this court to override its obligation to presume that the state court's findings of fact are correct.  See 28 U.S.C. § 2254(e)(1) (requiring federal habeas courts to apply a rebuttable presumption of correctness to state court findings).

The State Habeas Court ruled that issues known to Kepple but not briefed on appeal are waived pursuant to the state procedural rule announced in Avery, 131 N.H. at 143, 551 A.2d at 954-55, and reiterated in Sleeper v. Warden, 155 N.H. 160, 162-63, 920 A.2d 1200, 1202 (2007).  That rule is "firmly established" and "regularly followed" in New Hampshire.[5]  See Ortiz v. Blaisdell, No. 05-cv-350-JL, 2008 WL 4148940, *6 (D.N.H. Sept. 2, 2008).  In finding Kepple's claim waived, the state court thus relied on adequate state law grounds, and denied Kepple's habeas claim on a legally sufficient state law basis independent of the federal legal question presented in that petition.  This court may not review that finding.  See Martin, 131 S. Ct. at 1127.


II.  Merits

As discussed above, AEDPA applies to any claim "adjudicated on the merits" by a state court.  See 28 U.S.C. § 2254.  In addition to denying Kepple relief on the basis of waiver, the State Habeas Court, in an alternative ruling, decided the Brady issue on the merits.  While this court need not review that

---

[5]In New Hampshire, ineffective assistance of counsel claims are excepted from the general rule that a claim is procedurally barred by failing to raise the issue on direct appeal.  See State v. Pepin, 159 N.H. 310, 312-13, 982 A.2d 364, 366 (2009). This exception does not impact this court's ruling in this matter.

alternative merits-based ruling here, the court will do so, to provide an independent basis for its ruling on the pending motion and petition.

The state court's decision on the merits is subject to review regarding whether it "was contrary to, or involved an unreasonable application of, Federal law, as established by the Supreme Court . . . or was based on an unreasonable determination of the facts in light of the evidence" before the state court.  See 28 U.S.C. § 2254(d)(1) & (2).  The State Habeas Court denied Kepple's Brady claim on its merits because Kepple "failed to show that the undisclosed evidence was exculpatory."  The State Habeas Court acknowledged the state's obligation, under Brady, to disclose exculpatory evidence, but found that nothing in the FPD report, including the identity of the uncle, would "necessarily impeach the victim's credibility, support [Kepple's] defense, or tend to exonerate him."

> [W]hen the State withholds from a criminal defendant evidence that is material to his guilt or punishment, it violates his right to due process of law in violation of the Fourteenth Amendment. . . . [E]vidence is 'material' within the meaning of Brady when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.  In other words, favorable evidence is subject to constitutionally mandated disclosure when it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."

Cone v. Bell, ___ U.S. ___, 129 S. Ct. 1769, 1782 (2009) (citing

cases including Brady, 373 U.S. at 87, and United States v.

Bagley, 473 U.S. 667, 682 (1985), and quoting Kyles, 514 U.S. at

435).  To establish prejudice under Brady, Kepple must

demonstrate that there was a "reasonable probability that the

result of the trial would have been different if the suppressed

documents had been disclosed to the defense."  Strickler v.

Greene, 527 U.S. 263, 290 (1990) (internal quotation marks and

citation omitted).

A criminal defendant's right to exculpatory information

does not entitle him to every piece of information that may be

in the possession of the government.  See United States v.

Rodriguez, 29 F.3d 619, 1994 WL 249771, *2 (1st Cir. 1994)

(unpublished table decision).  The prosecutor's duty is to

disclose any exculpatory evidence which is "material either to

guilt or to punishment."  Brady, 373 U.S. at 87.  To establish

that a Brady violation has occurred, "a defendant must provide

the court with some indication that the materials to which he

. . . needs access contain material and potentially exculpatory

evidence."  Rodriguez, 1994 WL 249771 at *2 (quoting United

States v. Brandon, 17 F.3d 409, 456 (1st Cir. 1994)).

At the Pretrial Hearing, Kepple conceded that nothing,

outside of his fertile imagination, led him to believe that

J.P.'s uncle possessed potentially exculpatory information.

31

Nothing in the pretrial, trial, or post-conviction record that was before the State Habeas Court, or is presently before this court, indicates that Kepple has ever produced any grounds, beyond pure speculation, upon which a court could find that information possessed by the uncle had a reasonable probability of being favorable and material to Kepple's guilt or sentencing. The State Habeas Court's finding, that Kepple had failed to demonstrate that the information that had not been disclosed was exculpatory or favorable, was reasonable in light of the evidence before that court.

The petitioner has not cited any Supreme Court precedent that was either unreasonably applied by the state court or contrary to the state court's decision in this case.  This court now finds that the State Habeas Court's assessment of the facts before it, and the application of Brady to those facts, were reasonable, and not contrary to any Supreme Court precedent. The State Habeas Court's legal conclusion on the Brady question is entitled to deference, and the petition is denied on that issue.  See 28 U.S.C. § 2254(d) (habeas petition "shall not be granted" with respect to a claim adjudicated on the merits if §§ 2254(d)(1) and (2) do not apply).

**Conclusion**

For the foregoing reasons, the court finds that petitioner has failed to demonstrate that he is entitled to a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The motion for summary judgment (doc. no. 8) is GRANTED.  The petition for a writ of habeas corpus (doc. no. 1) is DENIED.

Rule 11(a) of the Rules Governing § 2254 Cases in the United States District Courts requires the district court to "issue or deny a certificate of appealability when it enters a final order adverse to the party."  The court will issue the certificate "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The petitioner has failed to make such a showing. A certificate of appealability is therefore DENIED.

**SO ORDERED.**

_____
Landya B. McCafferty
United States Magistrate Judge


Date: September 26, 2011

cc: Duncan MacCallum, Esq.
    Elizabeth C. Woodcock, Esq.

LBM:jba